429 So.2d 1249 (1983)
Douglas Edward COSTA, Appellant,
v.
Mary Ann COSTA, Appellee.
No. 82-1022.
District Court of Appeal of Florida, Fourth District.
March 30, 1983.
Rehearing Denied May 13, 1983.
*1250 Nancy Little Hoffman, Fort Lauderdale, and Stephen M. Bell, Plantation, for appellant.
T. Paul Hodge, Fort Lauderdale, for appellee.
GLICKSTEIN, Judge.
This is an appeal from an order, approving a post-judgment report of a general master in Broward County, and denying appellant's exceptions thereto. The report struck the restriction in the final judgment upon the former wife's right to remove the parties' two minor children (ages 7 and 9) from Broward and Palm Beach Counties. We reverse and remand.
The senior Broward County Circuit judge, then retired and on special assignment, who entered the final judgment in March, 1981, informed the parties at the close of the proceedings in February, 1981, as follows:
THE COURT: I think it would simplify things in this case if I would award the children to the Husband, but I can't do it. These are young girls, and I just can't award custody to the father.
I kind of agree with the psychiatrist in this respect, but young girls should be with the mother, and therefore we'll award the main custody to the mother.
I will provide that they have  that the father have generous visitation, to consist of every other weekend, and one afternoon during the week. He should be able to pick the children up whenever he's able to pick them up after work, when they are available.
He should have the responsibility to see that they do their homework on that night. Just one day a week he picks them up. If he picks them up on Friday, and he has them on Sunday, it should be Tuesday or Wednesday. He can pick the day of his choice. That is, he will have that day every week, but he will have the responsibility of providing the evening meal, and responsibility of seeing that they do their homework on that day.
... .
THE COURT: I will order her not to remove the children from the South Florida area without prior notification to the father, or without permission of the Court or his permission, if he agrees with it, whatever the circumstances. I mean, permanently move. I'm not talking about a visit.
During the summer vacation, during the time that you or she takes them, you can take them anywhere, as long as you bring them back. You should not remove the children from Broward County. I guess sometimes you have lived in Palm Beach County. I'll just say Broward to Palm Beach County. Do not move the residence of the children from Broward or Palm Beach County without the Court's permission, or the permission of the father, if you can agree on it.
If you have some reason for moving them back to Philadelphia or New Jersey, then you can come back to court, and the Court will have to make that determination, unless he disagrees with it.
The former wife's attorney announced at that time that he had no objection to the restriction on the right of his client to remove the children from the two county area.
Shortly after entry of final judgment each of the parties married another. In October, 1981, both filed petitions  the wife to remove the geographical restriction upon her custody, and the husband  to obtain custody.
In November, 1981, the former wife's petition was heard by the general master. She was the only witness and her very brief testimony of less than two pages of transcript established only that she had married Joseph Lahan, who had a job opportunity in Pennsylvania; that he could find a job in Broward County but not as *1251 lucrative as "up north"; and that she would be able to do much better for the children financially "up there." The former husband's motion for involuntary dismissal was denied. In view of the significance of the impact of any decision upon the two children and their relationship with their father, coupled with the concern and consideration given this matter by the trial judge who entered the final judgment, the motion should have been granted on this barren record. There was a genuine lack of substantial competent evidence that a material change in circumstances had occurred or that the modification of the restriction affecting custody was in the best interest of the children  both of which factors had to be shown in order to establish a prima facie case. See Sanders v. Sanders, 376 So.2d 880 (Fla. 1st DCA 1979), cert. denied, 388 So.2d 1117 (Fla. 1980).
Subsequently, in February, 1982, the general master heard the former husband's evidence in defense to the former wife's petition; and it overwhelmingly established that the removal of the restriction was contrary to the best interest of the children and confirmed the absence of any material change in circumstances to justify such removal. There was no rebuttal evidence by the former wife.
Reduced to its essence, the former wife's case appeared to be a desire to leave south Florida because she had remarried; and her new husband could earn $2.00 more per hour, or $4,000 per year, doing the same thing in Pennsylvania for which he was employed in Broward County; namely, as a respiratory therapist. The former wife had not been awarded rehabilitative alimony in the final judgment as she was employed as a quality assurance analyst in a Broward County hospital. She had no prospective employment arranged in Pennsylvania and there was no testimony as to what her earnings would be in that state. Accordingly, there was nothing in the record to show any financial benefit to the children by the contemplated move, the new husband having no obligation to them.
The former husband's case established that he was a school teacher, earning only $18,400 per year, thus making it prohibitive to visit his children with any regularity should they be removed to Pennsylvania. He had lived in south Florida since childhood. Both of the children were born in Florida and visited with their paternal grandparents, who are residents of this state (as is the maternal grandmother). The husband faithfully maintained the rights of visitation which the final judgment provided. Dr. Singer, a clinical psychologist, testified that to remove the children from proximity to their father was contrary to their best interest. Dr. Caddy, also a clinical psychologist, testified on deposition that the children's best interest lay in their being in close proximity to both parents.
In light of all the foregoing, the trial court should have granted the former husband's exceptions to the general master's report and disapproved the latter. The happiness and well being of these small children had been traumatized and wrecked in part by the dissolution. As is generally the case, the children were the only real victims of their parents' falling out of love with each other and into love with others. We find a certain irony in the fact that the two adults who created this unhappiness had counsel while the real victims were unrepresented. Removal of the children would only exacerbate the children's trauma; and the regular visitations with their father had to mitigate the harm already done. Both of these parents have a fundamental, continual and permanent obligation to these children that can only be satisfied by the love and attention the close proximity of the two of them can provide at this time. The court can best serve the children's interest by making it possible that this occurs; thus, the wisdom of the restriction in the final judgment  which is supported by substantial authority. See Giachetti v. Giachetti, 416 So.2d 27 (Fla. 5th DCA 1982); Foss v. Foss, 392 So.2d 606 (Fla. 3d DCA 1981); Scheiner v. Scheiner, 336 So.2d 406 (Fla. 3d DCA 1976); Brandon v. Faulk, 287 So.2d 714 (Fla. 1st DCA 1974) *1252 and McManus v. McManus, 238 So.2d 473 (Fla. 2d DCA 1970).
After the decision of the trial court in this case, the Florida Legislature enacted Chapter 82-96, Laws of Florida (1982), amending sections 61.13(2)(b) and (3), Florida Statutes (1981). In it the law makers declared:
It is the public policy of this state to assure each minor child frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and to encourage parents to share the rights and responsibilities of child-rearing.
... .
2. The court shall order that the parental responsibility for a minor child be shared by both parents unless the court finds that shared parental responsibility would be detrimental to the child. If the court determines that shared parental responsibility would be detrimental to the child, the court may order sole parental responsibility.
a. "Shared parental responsibility" means that both parents retain full parental rights and responsibilities with respect to their child and requires both parents to confer so that major decisions affecting the welfare of the child will be determined jointly. In ordering shared parental responsibility, the court may consider the expressed desires of the parents and may grant to one party the ultimate responsibility over specific aspects of the child's welfare or may divide those aspects between the parties based on the best interests of the child. When it appears to the court to be in the best interests of the child, the court may order or the parties may agree how any such responsibility will be divided. Such areas of responsibility may include primary physical residence, education, medical and dental care, and any other responsibilities which the court finds unique to a particular family and/or in the best interests of the child.
The declaration of such public policy and the use of the term "responsibility" as opposed to "custody" is aspirational. It would be society's greatest reward  tangibly and otherwise  were the future adult inhabitants of this state able to look back to the 1980's and reflect how their predecessors finally came to recognize the priority to be given the well being of children. Such future citizens would undoubtedly be the beneficiaries from (1) our present awareness that children are our most precious gift and entitled to enjoy the happiness which those adults responsible for them can provide; and that they are our only priceless commodity  the key to the well-being of society; and (2) our recognition that without prioritizing the physical, emotional and educational needs of children, all the efforts to eliminate crime, poverty and ignorance are only kneejerk, bandaid solutions which cure none of society's basic ills.
There is one final point about the general master's report that is objectionable; namely, his apparent reliance upon treatises as evidence of other foundation for the ultimate conclusion. Those texts and compendia to which the report refers were not part of the proceedings until their appearance in the report. If, as this court has said in Rice v. Clement, 184 So.2d 678 (Fla. 4th DCA 1966), such works could not be introduced as independent proof, it follows that the general master could not consider them as such. Further, we approve of the following principle contained in Hosking v. Hosking, 318 So.2d 559, 561 (Fla. 2d DCA 1975):
[d]ue process of law requires that the parties to a custody action be apprised of all of the evidence and considerations brought before the trial judge before the court arrives at a judgment in such a controversy.
It was error not to apprise the parties of such consideration, in timely fashion, in light of the importance of the testimony of the two clinical psychologists whose testimony was proper evidence. Not only would it be improper for this court to put its imprimatur upon the general master's reliance upon so-called experts' textbook opinions not received in evidence, to recognize *1253 any such opinion which disregards close, continuing contact of minor children with both parents after dissolution would disregard the public policy now expressly recognized by the legislature of this state; namely, "to assure each minor child frequent and continuing contact with both parents after the parents have separated or dissolved their marriage."
In summary, we emphasize the following:
1. This case does not have the blanket effect of preventing the removal of children from Florida in those actions for dissolution in which a parent objects thereto during the proceedings. Instead, it presents a situation in which custody, not removal, was the issue during a dissolution proceeding. In the final judgment, the trial judge, having observed all of the witnesses, reluctantly granted custody to the mother; and as a concomitant to such reluctance expressly prohibited the mother from removing the children from south Florida. The mother did not object to the restriction.
2. The significance of the present case lies in calling attention to the lawyers and judges of this district the public policy of this state newly expressed by the legislature; and in its recitation of conventional, historical principles of law  the sole factors which govern this case  that when a final judgment of dissolution expressly restricts removal of children from Florida, in order to effect a subsequent elimination of that restriction, there must not only be established, by substantial competent evidence, a material change of circumstances, but also that the elimination is in the best interest of the minor children involved.
3. The evidence upon which the general master and successor trial judge eliminated the restriction against removal in response to the mother's subsequent petition for modification of the final judgment was the fact that the mother's new husband could get a job in the northeast that paid him $2.00 an hour more than he had been getting in south Florida. There was a complete failure on the part of the mother to produce substantial competent evidence that a material change in circumstances had occurred since the original trial judge entered final judgment only months before; and there is nothing in this record to support the general master's conclusion that "equities" compelled the modification that was ordered.
4. There was no substantial competent evidence that elimination of the restriction against removal was in the best interest of the children. The expert testimony was uncontradicted that if it were unnecessary for the mother to leave south Florida, it would be better for the children that she remain; and there is no evidence that it was necessary that she leave  or that the $2.00 raise compelled her new husband to leave. In fact, just the opposite was established.
5. There was no predicate whatsoever in the record for the general master's conclusion that the mother must choose between her new husband and the children. Rather, it supports the conclusion that the new husband must choose between $2.00 an hour and his new wife.
DELL, J., concurs.
ANSTEAD, J., dissents with opinion.
ANSTEAD, Judge, dissenting:
While I find myself in agreement with virtually everything said in the majority opinion, and most especially with the concerns expressed for the children, I cannot agree that the trial court and the special master erred in approving the mother's move to Pennsylvania with the children. In my view the master's report and the trial court's approval thereof reflects a comprehensive and conscientious concern for the rights of all the parties in resolving a most difficult issue. That resolution was made no less difficult by the father's withdrawal of his request for custody. I would simply approve the master's and trial court's resolution of the issue as being within the bounds of discretion conferred upon them.
The standards applied by the master in deciding the issue are set out in his comprehensive final report:

*1254 h. The criteria the Court should look at in this type of matter is:
(1) The rights of the mother as the custodial parent.
(2) The rights of the father as the non-custodial parent but one who has been given specific visitation rights.
(3) The legal effect of the language of the final judgment regarding modification.
(4) The reasons for the wife's moving.
(5) Most importantly, the best interests of the children.
There is an abundance of authority to support the utilization of these standards and the decision of the special master and the trial court based thereon. D'Onofrio v. D'Onofrio, 144 N.J. Super. 200, 365 A.2d 27 (1976), aff'd, 144 N.J. Super. 352, 365 A.2d 716 (1976); Henry v. Henry, 119 Mich. App. 319, 326 N.W.2d 497 (Mich. App. 1983); Martinez v. Konczewski, 85 A.D.2d 717, 445 N.Y.S.2d 844 (1981); Hale v. Hale, ___ Mass. App. ___, 429 N.E.2d 340 (Mass. App. 1981); Burich v. Burich, 314 N.W.2d 82 (N.D. 1981). The gist of the holdings in these cases is that the courts should utilize other means, such as increased summer visitation or a shift in the financial burden of visitation, to deal with the problem and reserve the power to bar moves for the extreme case.
It is important to note that the trial court made no finding of bad faith by the mother. Indeed, the mother had not violated the custody restriction and had remained in Florida even though her new spouse moved to Philadelphia in the summer of 1981. The mother's testimony as to improved employment opportunities in Philadelphia for both she and her new husband was undisputed. The record does not reflect exactly how much the new husband was earning other than the fact that his earnings in his new job were over $4,000 more annually than in Florida.
There is also evidence to sustain the decision of the master. Interestingly, the parties were originally married in Philadelphia in 1970. Both parties remarried shortly after their dissolution. The father's new spouse has three children by a former marriage and is expecting a fourth by her present husband. The three experts that appeared were unanimous in their opinion that primary custody of the two children should be with the mother. The three also testified that ideally the children should reside in close proximity to the non-custodial parent but agreed that the ideal was not always obtainable. Dr. Justin Rubin, a child psychiatrist, who had seen the children a number of times in the preceding year before he discharged them as well and adjusted in December, 1981, testified that it was most important that the children remain with the mother even if that meant that they must move to Philadelphia. He testified that neither child wished to live with the father although they enjoyed their visits with him. He also related certain criticisms the children had of the father and his new home. Dr. Rubin also felt that the father required counseling in an effort to modify some of his behavioral problems around the children:
I think the children should see their natural father, provided he gets some counseling, since there are some areas that the children find objectionable and could cause problems perhaps in the future. But if the mother has to leave the state in order to be with her husband, and the children are with the mother, then they should go.
... .
What is she going to do, divorce her husband?
A second expert, Dr. Glenn Caddy, a psychologist hired by the father, also recognized that as a practical matter the ideal situation was not always obtainable. His only reservation about not endorsing the move out of state was his lack of information about the relationship between the children and their stepfather:
If there was an uncertain component in the works, it lies with the stepfather. And, all other things being equal, it would seem to me that there would be some risk if in fact the stepfather  if I *1255 felt completely comfortable about the issues of what the relationships with the kids and the step-father were, and the mother and the step-father, it would make it a lot easier to perhaps acquiese to the mother that, okay, it may not be ideal, but it may be tolerable to remove them from their father. Given that area that I just have no real access to at the present time, but a fair degree of discomfort about, simply because I don't have all of the facts, then I would have some reservations about having them removed from their father on a permanent basis. Temporarily, I don't see any problem.
There was conflicting evidence as to the nature of the relationship between the parents and the children and the step-parents and the children.
As I have noted before: who but the wisest among us, except in the clearest of cases, could divine what may be in the best interests of the children? Barnhill v. Barnhill, 353 So.2d 923 (Fla. 4th DCA 1978). The master and trial judge have done the best they could and I do not believe we should interfere. In doing so we are simply substituting our opinion on an issue which the triers of fact, by reason of their first hand contact with the situation, are uniquely suited to resolve.
I also cannot agree that the master erred in citing several major treatises on child custody in his final report. An examination of the cases cited in this opinion reflect that appellate courts do it all the time. Cf. Hale v. Hale, supra. The father has demonstrated no prejudice by reason of the master's action. Indeed, the father appears to concede that the master used the correct criteria but misapplied them in this case. I know of no public policy that requires special masters, especially those in Broward County who are frequently asked by trial courts to make recommendations concerning custody issues, to be empty-headed on the subject. I think we should applaud the master's interest and dedication in keeping current on a topic that is the subject of debate and study in several disciplines. This is not a case where a trial judge has gone out and determined by his own investigation whether a product was defective. Judges and special masters ought to be well-read on custody matters.